**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway, Suite 207, Roseland, NJ 07068
Phone: (973) 228-9898 - Fax: (973) 228-0303
www.mazieslater.com

**Writer's Direct Dial: 973-228-0151**
**Writer's Email**: ekatz@mazieslater.com

David A. Mazie*
Adam M. Slater*°
Eric D. Katz*°
David M. Freeman
Beth G. Baldinger
Matthew R. Mendelsohn*°
David M. Estes
Adam M. Epstein°
Cory J. Rothbort*°

*Certified by the Supreme Court of New Jersey as a Civil Trial Attorney

Karen G. Kelsen°
Michael R. Griffith°
Julia S. Slater°
Trevor D. Dickson
Nina C. Santacesaria⁺

°Member of N.J. & N.Y. Bars
⁺Member of Maryland Bar only

September 2, 2026

**Via ECF & Lawyers Service**

Honorable Susan D. Wigenton, U.S.D.J.
U.S. District Court
MLK Jr Federal Bldg.
50 Walnut Street, Ctrm. 5C
Newark, NJ 07101

Honorable Cari Fais, U.S.M.J.
U.S. District Court
Lautenberg U.S. P.O. & Courthouse
50 Walnut Street, Ctrm. PO 9
Newark, NJ 07101

Re: *United Healthcare Serv. v. Sood Med. Prac., LLC*, No. 2:26-cv-02921
**Supplemental Authority i/s/o Defendant's Motion to Dismiss (D.E. 33)**

Dear Judge Wigenton & Magistrate Judge Fais:

We represent Defendant, Sood Medical Practice, LLC in the above captioned matter. Defendant the following supplemental authority relating to, and in further support of, its pending Motion to Dismiss, filed on July 17, 2026. (D.E. 33).

In opposing the Motion, Plaintiff filed a brief relying on a *NY Times* article, a press release from a health insurance association, and congressional reports, all of which Plaintiff characterizes as "Other Authorities." (D.E. 35, at pg. vii), and relies on to argue the materials show "systematic abuse" of the NSA IDR (*id*. at pgs. 4-6). The Complaint also quotes similar materials, including a *Health Affairs* publication. (D.E. 1, at pgs. 14-15, n.23-28).

To the extent the Court will consider such extra-pleading materials (and related argument) in deciding a Rule 12 motion, Defendant submits recent similar "authority" relating to the ongoing issues with the NSA IDR. In response to the insurance industry's press releases and reports villainizing healthcare providers, the American College of Emergency Physicians, the American College of Radiology and the American Society of Anesthesiologists issued a joint statement (after Defendant had filed its reply). *See* ACEP, ACR & ASA, *Health Affairs Article IDR 'Cost' Claim Inflated Due to Reliance on Flawed QPA Benchmark*" (Aug. 27, 2026).[1]

The national medical associations challenged the factual assertions made by Plaintiff in this action (including the *Health Affairs* report that Plaintiff relies on):

> The national medical associations point out that the report's cost claim is built on a deeply flawed premise: that the insurer-calculated Qualifying Payment Amount (QPA) is accurate and represents an appropriate in-network payment rate. The evidence is overwhelmingly clear that QPAs are often inaccurate and unreasonably low. QPA calculations are opaque and independently unverifiable by physicians.
>
> The [*Health Affairs*] paper counts $15.6 billion in IDR awards above the QPA as a cost attributable to the IDR, nearly 70% of the authors' total estimate. Errors in the Public Use Files (PUF) files have been publicly acknowledged but are not fully reflected in the *Health Affairs* analysis. It is estimated that at least $6 billion in the PUF may be either clerical errors or already accounted for before the IDR process.
>
> "The paper posits that appropriate payments to front-line physicians for patient care translate into higher premiums. This framing overlooks the reality of big insurance: many of the nation's largest commercial health insurers and their parent companies report annual profits in the billions of dollars," said ASA President Patrick Giam, M.D., FASA. "If insurers choose to pass the cost of reasonable physician payments on to consumers rather than absorb those costs within their substantial revenue and profits, that is an unfortunate, profit-driven, business decision, not an inevitable consequence of the IDR process."
>
> "The data continue to show that the IDR process is being used because insurers increasingly refuse to negotiate fair rates, offer inadequate reimbursement, and narrow physician networks," said ACR CEO Dana H. Smetherman, M.D., MPH, MBA, FACR. "**When arbitrators consistently reject insurer payment offers and courts find flaws in how QPAs are calculated, policymakers should ask whether the median in-network rate calculations themselves are distorted**; a

---

[1] *Available at* www.asahq.org/about-asa/newsroom/news-releases/2026/08/health-affairs-article-idr-cost-claim-inflated-due-to-reliance-on-flawed-qpa-benchmark (visited 9/2/26).

> **fair and effective IDR process depends on accurate payment data**, **transparency**, **and accountability from all stakeholders**."
>
> A recent federal court decision offers further proof that QPAs can be distorted by unreasonable, artificially low rates. On August 11, the U.S. Court of Appeals for the Fifth Circuit ruled that federal QPA regulations improperly permitted insurers to include non-negotiated "ghost rates" and exclude certain bonus or incentive payments from QPA calculations. The court concluded that these practices resulted in artificially low QPAs.
>
> **The same ruling pointed to physicians' high IDR win rates and the frequency with which arbitrators selected payments above the QPA as evidence of artificially low QPAs**, **not proof that physicians were gaming the system**.
>
> ACEP, ACR and ASA agree policymakers should examine unusually large IDR awards and ensure the process operates efficiently. But policymakers should also examine inaccurate QPAs, inadequate initial payments, extremely low insurer offers, insurer defaults, and failures to pay IDR awards in a timely manner.
>
> "The NSA and the IDR process must ensure that physicians who provide care to patients can receive fair and reasonable in-network payments after that care has been delivered," said ACEP President L. Anthony Cirillo, M.D., FACEP. "Congress and the Administration should ensure QPAs are accurate, require insurers to participate in the IDR process and negotiate with physicians in good faith. It is essential to preserve a fair IDR process that holds both insurers and physicians accountable."

*Id*. (emph. added).[2]

---

[2] *Accord* Potter, *Who's Really Gaming the No Surprises Act?*, HEALTH CARE un-covered (July 8, 2026) ("If an insurer's initial offer, and the [QPA] it uses to justify that offer, is unreasonably low to begin with, then of course arbitration produces a large award relative to that number. That is not evidence the process is broken. That is evidence the insurer's offer was never made in good faith."), *available at* https://healthcareuncovered.substack.com/p/whos-really-gaming-the-no-surprises (visited 9/2/26); Potter, *No Surprises, But Plenty of Abuses: How Insurers Are Pulling the Strings on the No Surprises Act*, HEALTH CARE un-covered (Oct. 10, 2026) ("doctors tell me that even when they prevail in an arbitrated dispute, **insurers often refuse to pay promptly**, **if at all**"), *available at* https://healthcareuncovered.substack.com/p/no-surprises-but-plenty-of-abuses (visit-ed 9/2/26); Potter, *UnitedHealth Helped Write the Law It Now Blames for Your Rising Premiums*, HEALTH CARE un-covered (July 21, 2026) ("UnitedHealth itself had spent considerable resources to fund research … to persuade lawmakers that there was a need for the NSA. It quietly bankrolled and shaped the academic research that pushed Congress to act … and it did so precisely because it expected the law to hand insurers leverage over doctors and hospitals."), *available at* https://healthcareuncovered.substack.com/p/no-surprises-but-plenty-of-abuses (visited 9/2/26).

In sum, contrary to Plaintiff's framing, the ongoing problems with the NSA IDR are not one-sided. The national medical association's statement references *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 23-40605, __ F.4th ___ (5th Cir. Aug. 11, 2026), which also addressed the reason why providers tend to prevail in NSA IDRs:

> The agencies' error has upended the NSA's dispute-resolution process. Congress intended the QPA[3] to serve as a focal point of provider-insurer negotiations as to which party would cover the balance of a patient's bill. Because the agencies directed insurers to include non-negotiated ghost rates, the resulting QPAs were artificially low. How do we know? For one, the number of arbitrations dwarfed the agencies' expectations by a factor of 84. For two, providers prevailed in over 80% of arbitrations. And for three, arbitrators selected a reimbursement rate higher than the QPA in a whopping 85% of arbitrations. **These statistics underscore that the agency's inclusion of <u>artificially low</u> reimbursement rates is contrary to the statutory text**.

*Id.*, 2026 WL 2322331, at *3 (emph. added).[4]

In sum, to the extent the Court will consider the press releases, media and other materials that Plaintiff submitted to assert providers are abusing the NSA IDR, then the Court should also consider the opposing statements and media refuting the "authorities" that Plaintiff cites.

Respectfully submitted,

*/s/ Eric D. Katz*

ERIC D. KATZ

---

3 "The QPA is the median of the total maximum rates in an insurer's contract for an item or service that a provider provides and furnishes, sorted by specialty and geographic region." *Id.*, *1.

4 *See also* Velliky, *Fifth Circuit Decision on TMA III: The No Surprises Act's Yard Stick is a Foot Too Short* (Aug. 12, 2026) (discussing healthcare economics relating to 5th Circuit's Aug. 11th opinion), *available at* https://patrickvelliky.substack.com/p/fifth-circuit-decision-on-tma-iii (visited 9/2/26); Velliky, *Insurers Prevail Under the No Surprises Act Framework over 95% of the Time* (Apr. 23, 2026) ("The insurance industry wants policymakers to think the NSA unfairly favors doctors. Their own data proves otherwise."), *available at* https://patrickvelliky.substack.com/p/insurers-prevail-under-the-no-surprises (visited 9/2/26).