# MAZIE SLATER KATZ & FREEMAN, LLC

103 Eisenhower Parkway, Suite 207, Roseland, NJ 07068
Phone: (973) 228-9898 - Fax: (973) 228-0303
www.mazieslater.com

**Writer's Direct Dial: 973-228-0151**
**Writer's Email**: ekatz@mazieslater.com

David A. Mazie*
Adam M. Slater*°
Eric D. Katz*°
David M. Freeman
Beth G. Baldinger
Matthew R. Mendelsohn*°
David M. Estes
Adam M. Epstein°
Cory J. Rothbort*°

*Certified by the Supreme Court of New Jersey as a Civil Trial Attorney

Karen G. Kelsen°
Michael R. Griffith°
Julia S. Slater°
Trevor D. Dickson
Nina C. Santacesaria+

°Member of N.J. & N.Y. Bars
+Member of Maryland Bar only


November 9, 2026

**Via ECF & Lawyers Service**

Honorable Susan D. Wigenton, U.S.D.J.
U.S. District Court
MLK Jr Federal Bldg.
50 Walnut Street, Ctrm. 5C
Newark, NJ 07101

Honorable Cari Fais, U.S.M.J.
U.S. District Court
Lautenberg U.S. P.O. & Courthouse
50 Walnut Street, Ctrm. PO 9
Newark, NJ 07101

Re: *United Healthcare Serv. v. Sood Med. Prac., LLC*, No. 2:26-cv-02921
**Second Supplemental Authority i/s/o Defendant's Motion to Dismiss**

Dear Judge Wigenton & Magistrate Judge Fais:

We represent Defendant, Sood Medical Practice, LLC in the above captioned matter. Defendant submits the following supplemental authority relating to, and in further support of, its pending Motion to Dismiss (D.E. 33), which was filed on July 17, 2026.

## I. *Anthem Health Plans of Va. v. AGS Health*

After Defendant filed its August 21, 2026 reply brief (D.E. 36) in further support of its Motion to Dismiss (D.E. 33), another federal issued a decision under analogous circumstances and dismissed another of the health insurance industry's copycat "NSA fraud" cases. Defendant files this letter to bring to this Court's attention the recent opinion in *Anthem Health Plans of Va. v. AGS Health*, No. 7:25-804, 2026 WL 2942234 (W.D. Va. Sept. 30, 2026) (*see* **Exhibit 1** hereto).

Like Plaintiff's allegations in this action, in *AGS* a health insurer sued healthcare provider entities for allegedly submitting "ineligible" claims to the independent dispute resolution ("IDR") mechanism created by the No Suprises Act ("NSA"). *Id.* at *1-2. Like the five federal courts in Pennsylvania, Hawai'i, California, Texas and Georgia that have considered the coordinated "NSA fraud" cases filed across the country,[1] a sixth federal court has concurred.

*AGS* held that the health insurer failed to state a claim, federal courts lack jurisdiction over these "NSA fraud" cases, and dismissed "with prejudice" because permitting the health insurer to amend "would be futile." *Id.* at *4-7. In granting the defendant-healthcare providers' motion to dismiss, the Virginia court stated the following reasons:

> Plaintiffs' claims all rest on the same theory: that Defendants submitted ineligible disputes to the IDR process, falsely attested to eligibility, manipulated the IDR process by flooding it with open negotiations and IDR initiations, and obtained IDR awards they should not have received.
>
> These claims seek to invalidate or collaterally attack IDRE determinations, and the Court lacks subject matter jurisdiction to entertain all but the vacatur claim. The [NSA] incorporates the [FAA], which provides the **exclusive avenue** for [federal] judicial review of IDR determinations.
>
> Parties may not circumvent the [FAA's] limits by repackaging challenges to arbitration awards as RICO or ERISA claims.
>
> * * *
>
> Here, each of Plaintiffs' non-vacatur claims would require the Court to find that the IDREs erred in deciding eligibility, to invalidate or disregard the payment determinations, and to award damages or other relief based on those payment awards. **This is precisely the type of judicial review Congress <u>foreclosed</u> in the** [**NSA**].

---

[1] *UnitedHealthcare of Pa. v. NorthStar Anesth. of Pa.,* 2026 WL 1145885 (E.D. Pa. Apr. 28, 2026) (dismissing UnitedHealthcare's near-identical "NSA fraud" lawsuit against other healthcare providers); *UnitedHealthcare Ins. v. Maui Mem'l Emer'y Med.*, 2026 WL 1965882 (D. Haw. July 7, 2026) (**same**); *Anthem Blue Cross Life & Health Ins. v. HaloMD*, 2026 WL 982629 (C.D. Cal. Apr. 9, 2026) (**same** re Anthem Blue Cross); *Blue Cross Blue Sh. Tex. v. HaloMD*, 2026 WL 1557492 (E.D. Tex. May 22, 2026) (**same** re Blue Cross Texas); *Blue Cross Blue Sh. Healthcare Plan Ga. v. HaloMD*, 2026 WL 2017291 (N.D. Ga. July 10, 2026) (**same** re Blue Cross Georgia)).

> * * *
>
> I disagree with this [health insurers'] interpretation. When the [NSA] is read as a whole, Congress provided the requisite clear and convincing evidence that [federal] judicial review is limited to the [FAA's] narrow vacatur grounds.
>
> * * *
>
> Thus, eligibility determinations [the sole basis of Plaintiff's lawsuit here] — because they are a necessary predicate to the payment determination — fall within the [federal] judicial review bar.
>
> * * *
>
> In sum, Plaintiffs' theory that Defendants submitted ineligible disputes and thereby obtained improper IDR awards **is <u>inseparable</u> from the IDR's payment determination process**. Because Plaintiffs seek to unwind IDR awards through claims collateral to the permissible vacatur review, the **Court <u>lacks</u> subject matter <u>jurisdiction</u> over those claims**.
>
> * * *
>
> Two federal courts addressing fraud claims arising out of the IDR process have held that vacatur is unavailable **because [like here] the plaintiffs <u>had the information</u> necessary to object <u>during the arbitration</u>**.
>
> * * *
>
> Plaintiffs therefore cannot credibly claim that the alleged fraud was not discoverable and cannot satisfy the requirements of [FAA] § 10(a)(1).

*AGS*, at *4-6 (fn. omitted; emph. added). In sum, a seventh federal jurist has joined the majority view that outside of an FAA *vacatur* action, there is no federal subject-matter jurisdiction over this type of case. Accordingly, the Complaint in this action should be dismissed with prejudice.

## II. <u>*Arizona Physicians IPA Inc. v. IAS Arizona PLLC*</u>

In the same vein, after Defendant filed its reply in support of dismissal, an eighth jurisdiction joined the consensus to dismiss another of UnitedHealthcare's "NSA fraud" lawsuits. In *Arizona Physicians IPA Inc. v. IAS Arizona PLLC*, a UnitedHealthcare entity – represented by the <u>same attorneys</u> that are before this Court (Mr. Tolley, Ms. Williams & Mr. Trach) – sued more healthcare providers in Arizona for alleged "NSA fraud." *See* No. 26-667, 2026 WL 3082464 (D. Ariz. Oct. 15, 2026) (*see* **Exhibit 2** hereto). In the most-recent decision, UnitedHealthcare sued

those healthcare providers for state common law fraud and a declaratory judgment based on that provider allegedly filing an "ineligible" Medicaid claim in an NSA IDR. *Id.* at *1.

The federal jurist in the District of Arizona concluded there was no jurisdiction and dismissed UnitedHealthcare's copycat complaint, denying it leave to amend:

> United does not argue that its claim for declaratory judgment … confers jurisdiction. Nor could it. "The operation of the Declaratory Judgment Act is procedural only and does not confer arising under jurisdiction"
>
> * * *
>
> That leaves United's state-law fraud claim as the only potential source for subject matter jurisdiction. That claim does not confer jurisdiction either. To start, the claim fails the well-pleaded complaint rule because it is not "based on federal law." United's allegations that [plaintiff] IAS knowingly violated the NSA do not "constitute a federal claim" or "transform" a state-law fraud claim into a federal one.
>
> **United's fraud claim likewise fails *Grable* [jurisdiction] because it does not present a "substantial" federal issue.**
>
> * * *
>
> United argues the federal issues are substantial because they are "significant to the federal system" and present "nearly pure issues of law." In reality, the disputed issues are primarily factual. United's fraud claim does not require an analysis of competing legal interpretations of the NSA; both parties agree Medicaid claims are not eligible for IDR under that statute and its implementing regulations. At most, the elements of fraud would implicate whether IAS made a false representation when it submitted the claim at issue. **But that is a fact-bound determination specific to the case at hand, not a legal interpretation of the NSA.** And given the limited impact such a factual determination would have on any other case — much less "numerous other cases" — the federal issue here is not "significant to the federal system as a whole."
>
> * * *
>
> A claim must pass all four of *Grable*'s hurdles for jurisdiction to lie. Because the federal issue within United's [state-law] fraud claim is not "substantial," the court's analysis may end there. ***Grable* does not supply federal-question jurisdiction here.**
>
> * * *
>
> Both of United's claims are dismissed for lack of subject matter jurisdiction. Leave to amend is not appropriate because any

> amendment would futile: the core of United's complaint does not give rise to a federal issue that satisfies all four *Grable* factors.

*Arizona*, at *2-3 (citations, brackets & fns. omitted; emph. added).

That court also found that "[i]ndependently, even if United could establish that IAS made a false representation, United has pleaded its fraud claim out of court. An Arizona fraud claim requires the same party who is ignorant of and relies on the falsity to suffer the consequent injury. Yet United knew the claim at issue was ineligible for IDR at the outset, and the IDRE's alleged reliance on the falsity did not cause that entity injury. These defects in United's allegations are sufficient alternative grounds for dismissal." *Id*. at *3 n.2. Plaintiff's fraud count here fails for the same reasons, as argued in Defendant's briefs (D.E. 33-1, pgs. 32-37; D.E. 36, pgs. 12-14).

Consistent with *NorthStar*, *Maui*, *Anthem*, *Blue Cross Tex*., *Blue Cross Ga*. and *AGS*, the *Arizona* court most-recently held that federal courts – as forums of limited jurisdiction in our federalist legal system – lack authority to hear or decide the healthcare industrial complex's national blitz of "NSA fraud" cases against healthcare providers.

## III. ***NY Times*: "Flouting Consumer Law, Insurers Refuse to Pay Medical Bills…"**

In opposing the Motion, Plaintiff filed a brief relying on a July 22, 2026 *NY Times* article written by Ms. Kliff, Ms. Sanger-Katz and Ms. Parlapiano, which Plaintiff characterized as "Other Authorities" and relied on to argue the *NY Times* article show "systematic abuse" of the NSA IDR system. (D.E. 35, at pgs. vii, 4-6). To the extent the Court will consider that *NY Times* article (and Plaintiff's other extra-pleading materials) and the related argument in deciding Defendant's pending Rule 12 Motion, Defendant submits and brings to the Court's attention that the **same** authors and periodical issued a new article last week telling more of the story: Ms. Sanger-Ka to & Ms. Kliff, Flouting Consumer Law, Insurers Refuse to Pay Medical Bills for Emergency Care

(NYT Nov. 3, 2026) (*see* **Exhibit 3** hereto).[2] A mantra in Plaintiff's Complaint, and opposition to the pending Motion to Dismiss, is that the NSA IDR process is causing Plaintiff to incur a significant increase in costs, painting a one-sided picture of the problems with the NSA.

However, as last week's *NY Times* article reveals, in practice the health insurance industry has adopted a systematic policy of simply ignoring the NSA IDR awards, including refusing to pay any NSA IDR awards when an insurer unilaterally deems an award to be invalid:

> The insurer's willful nonpayment is the latest in a cascade of unintended consequences brought about by a widely supported [NSA] law that was intended to protect patients from surprise medical bills.
>
> * * *
>
> Insurers have sued doctors and lobbied Congress to change the law…. But with Washington moving slowly, they have adopted the strategy of simply declining to pay. **Nearly 30 percent of arbitration awards has gone <u>unpaid since 2024</u>**
>
> * * *
>
> Anthem's nonpayment rate was the highest by far, at 74 percent, but other large insurers, including Cigna, **UnitedHealthcare** and Aetna, have **also <u>declined to pay</u> a significant portion**.
>
> * * *
>
> The standoff has created dysfunction and lawlessness in a system that a growing number of lawmakers and administration officials say needs to be changed.
>
> * * *
>
> **Most large health insurers told The Times it is their <u>policy not to pay awards</u>** if they believe the claim should never have qualified for the arbitration process, even when the arbitrator determined it to be eligible.
>
> * * *
>
> Doctors have said that the nonpayments make it hard to manage their practices.
>
> * * *
>
> "The insurance companies cannot unilaterally decide to breach a federal law if they don't like the end result," Mr. McCarty [PHI executive] said. "That's essentially what they are doing."
>
> * * *

[2] *Available at* www.nytimes.com/2026/11/03/us/insurers-nonpayment-arbitration.html (visited 11/9/26).

> Anthem, like all major insurers [UnitedHealthcare], supported the No Surprises Act when Congress was writing the legislation during the first Trump administration.
>
> * * *
>
> The [U.S.] Labor Department, which oversees large employer health plans, is investigating Anthem's failure to pay arbitration awards, according to documents The Times obtained.
>
> * * *
>
> HaloMD spokesman Patrick Velliky said that the insurers' lawsuits [similar to this action against Defendant] were "an attempt to intimidate physicians and clinicians out of seeking fair and sustainable reimbursement."
>
> * * *
>
> **The insurer** [**UnitedHealthcare**] **is** "**<u>not</u> the final decider**," said Ms. Keith [director of Georgetown University's Center for Health Policy and the Law].
>
> * * *
>
> The No Surprises Act gives the Trump administration authority to fine health insurers $100 for each day they do not pay an arbitration award. So far, it has not issued a single penalty.
>
> Doctors have submitted hundreds of complaints about unpaid awards to the Centers for Medicare and Medicaid Services, which oversee the system. Those that The Times spoke with said they had rarely received a response.
>
> * * *
>
> "There are problems on both sides, and I'll readily admit that," [U.S.] Representative Greg Murphy, Republican of North Carolina, said in an interview. But Mr. Murphy, who worked as a urologist before running for office, said **he believed that the** "**<u>majority of abuses</u>**" **had been <u>committed by insurers [UnitedHealthcare]</u> who <u>do not pay</u> awards**. He has introduced legislation that would stiffen penalties for nonpayment.

*Id*. (emph. added). Imagine if other litigants in a legal or similar forum elected to unilaterally ignore and refuse as a policy to participate in a justice process or ignore judgements because it disagrees with the judicial process or a court's judgment. Such a policy is outrageous. Contrary to the earlier *NY Times* article and other materials relied on by Plaintiff, the spin in its Complaint and opposition to the Motion is neither complete nor accurate. The truth is that while Plaintiff may object to the volume of IDRs, quantum of IDR awards or process for qualifying NSA

arbitrators, in practice the health insurance industry as a policy has largely refused to pay valid IDR awards for years, and when doctors started suing, have launched strained "fraud" cases in retaliation. This, and similar actions, are part of the health insurance industry's political, public relations and financial campaign to undermine and frustrate the entire NSA IDR process.

## IV. Conclusion

Therefore, the attempts of Plaintiff and other UnitedHealthcare affiliates to use federal actions to intimidate or legislate should be categorically rejected. For the reasons already detailed in Defendant's brief (D.E. 33-1), reply (D.E. 36), September 2nd supplemental authority (D.E. 37) and this submission, this action should be dismissed without leave to amend because – as stated by the 8 prior jurist to review these "NSA fraud" complaints – Plaintiff's Complaint here fails to state a claim under federal law nor is it viable in a federal forum.

Respectfully submitted,

*/s/ Eric D. Katz*

ERIC D. KATZ

# Exhibit 1

2026 WL 2942234
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Roanoke Division.

ANTHEM HEALTH PLANS OF VIRGINIA et al., Plaintiffs,
v.
AGS HEALTH et al., Defendants.

Civil Action No.: 7:25-cv-00804
|
Signed September 30, 2026

**Attorneys and Law Firms**

Jason Mayer, Crowell & Moring LLP, Chicago, IL, Jed Wulfekotte, Crowell & Moring LLP, Washington, DC, Johneal Moore White, Glenn Robinson Cathey Memmer & Skaff, PLC, Roanoke, VA, for Plaintiffs.

William George Laxton Jr., Jones Day, Washington, DC, B. Kurt Copper, Jones Day, Dallas, TX, Heather M. O'Shea, Jones Day, Chicago, IL, Jessica Marie Sarkis, Jones Day, Washington, DC, for Defendant AGS Health.

Phillip Rakhunov, Susan Cooke, Pollack Solomon Duffy LLP, Boston, MA, John Stanfield Buford, Hancock, Daniel & Johnson, LLC, Glen Allen, VA, for Defendants The Schumacher Group of Louisiana, Inc., The Schumacher Group of Virginia, Inc., Ingleside Emergency Group, LLC, Kingsford Emergency Group, LLC, Lake Spring Emergency Group, LLC, Western Virginia Regional Emergency Physicians, LLC, Wildwood Emergency Group, LLC.

## MEMORANDUM OPINION

Robert S. Ballou, United States District Judge

***1** Plaintiffs Anthem Health Plans of Virginia and Healthkeepers are licensed health maintenance organizations in Virginia. Their claims arise out of the independent dispute resolution ("IDR") process created by the No Surprises Act to resolve certain billing disputes between health plans and out-of-network providers. Defendants Schumacher Group of Louisiana and Schumacher Group of Virginia (collectively, "SCP") are affiliated entities that provide staffing and management services to hospitals and healthcare facilities, including emergency and hospital medicine services. Defendants Ingleside Emergency Group, Kingsford Emergency Group, Lake Spring Emergency Group, Western Virginia Regional Emergency Physicians, and Wildwood Emergency Group (the "Provider Defendants") belong to a network of emergency medicine provider groups affiliated with SCP. Defendant AGS is a healthcare revenue cycle management company that serves as the billing and revenue cycle manager for SCP and the Provider Defendants.

Before the Court are Defendants' Motions to Dismiss (Dkts. 37, 39) and related Request for Judicial Notice (Dkt. 57) which the Court **GRANTS**.

## FACTS

The No Surprises Act, effective January 2022, bans surprise billing for three categories of out-of-network healthcare: (1) emergency services, (2) non-emergency services by out-of-network providers at in-network facilities, and (3) air ambulance services. Dkt. 1 ¶ 37 (citing 42 U.S.C. §§ 300gg-131–132, 300gg-135). The Act also establishes a dispute resolution process known as an IDR to resolve specific types of eligible surprise billing disagreements. *Id.* ¶ 38 (citing 42 U.S.C. § 300gg-111(c)).

When a health plan receives an eligible claim, it either makes an initial payment or issues a notice of denial of payment. *Id.* ¶ 39 (citing 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I)). If the provider is dissatisfied with the outcome, it may initiate open negotiations with the health plan over a period of 30 days. *Id.* ¶ 40 (citing 42 U.S.C. § 300gg-111(c)(1)(A)). If negotiations fail, the provider may then initiate the IDR process to determine the out-of-network rate for qualified IDR items or services. *Id.* ¶ 41 (citing 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i)).

After a provider initiates the IDR process, the parties select, or the Department of Health and Human Services appoints, an Independent Dispute Resolution Entity ("IDRE"). *Id.* ¶ 69 (citing 42 U.S.C. § 300gg-111(c)(4)(F)). The IDRE reviews the information submitted in the notice of IDR initiation to "determine whether the IDR process applies." *Id.* ¶ 70 (citing 45 C.F.R. § 149.510(c)(1)(v)). If it determines the process does apply, the IDRE makes a payment determination. *Id.* ¶ 71 (citing 42 U.S.C. § 300gg-111(c)(5)(A)). This determination is binding unless there was "a fraudulent claim or evidence

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of misrepresentation of facts presented to the IDR entity involved regarding such claim." *Id.* ¶ 74 (quoting 42 U.S.C. § 300gg-111(c)(5)(E)(i)). Further, the determination is not subject to judicial review "except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9." *Id.* ¶ 75 (quoting 42 U.S.C. § 300gg-111(c)(5)(E)(II)). Section 10(a) of title 9, which refers to the Federal Arbitration Act, allows for vacatur of an arbitration award:

> ***2** (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)–(4).

Importantly, the IDR process is only available for a "qualified IDR item or service." *Id.* ¶ 43 (quoting 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2)). Of particular relevance here, the IDR process does not apply if an existing state law already governs out-of-network payment rates. *Id.* ¶ 44 (citing 42 U.S.C. § 300gg-111(a)(3)(H)–(K), (c)(1); 49 C.F.R. § 149.510(a)(2)(xi)(A)). In Virginia, the Virginia Balance Billing Law covers emergency, surgical, and ancillary services and provides its own payment-setting mechanism, rendering many disputes for healthcare services by Virginia providers ineligible for the No Surprises Act's IDR process. *Id.* ¶ 45 (citing Va. Code Ann. §§ 38.2-3445.01(A), 38.2-3445.02).

Plaintiffs in this case administer healthcare claims and IDR proceedings for members and plan sponsors. *Id.* ¶¶ 25–29. They contend that, despite built-in eligibility safeguards and their own notices to providers, Defendants submitted thousands of disputes that were plainly ineligible for the IDR process—particularly disputes governed by Virginia law. *Id.* ¶ 109. Plaintiffs allege that Defendants (1) made repeated false representations and attestations of eligibility; (2) manipulated the IDR process by submitting large numbers of open negotiations and IDR initiations; and (3) demanded inflated, commercially unreasonable payment amounts. *Id.* ¶ 113. They claim that, since 2024, nearly 60 percent of Defendants' disputes that reached a determination were ineligible and Defendants have improperly secured millions of dollars in IDR awards. *Id.* ¶ 130.

Plaintiffs assert the following claims:

> Count I – Violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c), based on allegations that Defendants knowingly submitted claims that were ineligible for the IDR process and knowingly demanded payments far in excess of commercially reasonable amounts.
>
> Count II – Conspiracy to Violate RICO Act, 18 U.S.C. § 1962(c), based on the allegations above.
>
> Count III – Conspiracy to Injure Another in Trade, Business or Profession, Va. Code Ann. §§ 18.2-499–500, based on the allegations above.
>
> Count IV – Violation of Virginia's Unfair and Deceptive Trade Practices Act, Va. Code Ann. §§ 59.1-196 *et seq.*, based on the allegations above.
>
> Count V – Common Law Fraud/Fraudulent Misrepresentation based on the allegations above.
>
> Count VI – Constructive Fraud based on the allegations above.
>
> ***3** Count VII – Civil Conspiracy based on the allegations above.
>
> Count VIII – Conversion based on the allegations above.
>
> Count IX – Vacatur of No Surprises Act IDR Awards based on the allegations above, brought in the alternative.
>
> Count X – Violation of ERISA § 502(a)(3) based on the allegations above.

Defendants filed substantively similar motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

## STANDARD OF REVIEW

### I. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss an action for lack of subject matter jurisdiction. In reviewing a Rule 12(b)(1) motion, a court determines "whether plaintiff's allegations, standing alone and taken as true [plead] jurisdiction and a meritorious cause of action." *Allianz Ins. Co. of Canada v. Cho Yang Shipping Co.*, 131 F. Supp. 2d 787, 789 (E.D. Va. 2000) (quoting *Dickey v. Greene*, 729 F.2d 957, 958 (4th Cir. 1984)). The party seeking to invoke the court's authority bears the burden of establishing subject matter jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

"When a defendant files a motion under Rule 12(b)(1) challenging subject-matter jurisdiction and relying simply on the allegations of the complaint, the court must take the jurisdictional facts alleged as true—as in the case of a motion filed under Rule 12(b)(6)—and determine, as a matter of law, whether the court has jurisdiction." *Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 292 (4th Cir. 2022). "But if the defendant disputes the facts alleged for jurisdiction, providing the court with contradicting facts, the court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.* (internal quotation marks omitted). "A Rule 12(b)(1) motion to dismiss should be granted 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.' " *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187, 194 (4th Cir. 2022) (quoting *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999)).

**II. 12(b)(6)**

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Legal conclusions, however, are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 679.

**ANALYSIS**

**I. Subject Matter Jurisdiction -Counts I–VIII, X**

***4** Plaintiffs' claims all rest on the same theory: that Defendants submitted ineligible disputes to the IDR process, falsely attested to eligibility, manipulated the IDR process by flooding it with open negotiations and IDR initiations, and obtained IDR awards they should not have received. These claims seek to invalidate or collaterally attack IDRE determinations, and the Court lacks subject matter jurisdiction to entertain all but the vacatur claim.

The No Surprises Act incorporates the Federal Arbitration Act, which provides the exclusive avenue for judicial review of IDR determinations. Parties may not circumvent the Federal Arbitration Act's limits by repackaging challenges to arbitration awards as RICO or ERISA claims. *See Anthem Blue Cross Life & Health Ins. Co. v. HaloMD LLC*, No. 8:25-CV-01467-KES, 2026 WL 982629, at *9–10 (C.D. Cal. Apr. 9, 2026) (dismissing Anthem's RICO and ERISA claims and requests for declaratory and injunctive relief for lack of jurisdiction); *Aetna Health Inc. v. Radiology Partners, Inc.*, No. 3:24-CV-1343-BJD-LLL, 2026 WL 1556164, at *4 (M.D. Fla. Apr. 16, 2026) (explaining that the No Surprises Act and Federal Arbitration Act preempt Aetna's remaining claims because they are premised on the same facts as the fraud claims); *Blue Cross Blue Shield of Tex., v. HaloMD, LLC*, 5:25-cv-00132, 2026 WL 1557492, at *4–7 (E.D. Tex. May 22, 2026) (dismissing BCBS's claims as "an impermissible collateral attack on the IDR awards"); *Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. v. Halomd, Inc.*, No. 1:25-CV-2919-TWT, 2026 WL 2017291, at *13, *15 (N.D. Ga. July 10, 2026) (finding that the court lacked jurisdiction over RICO and ERISA claims used to collaterally attack IDR awards). Here, each of Plaintiffs' non-vacatur claims would require the Court to find that the IDREs erred in deciding eligibility, to invalidate or disregard the payment determinations, and to award damages or other relief based on those payment awards. This is precisely the type of judicial review Congress foreclosed in the No Surprises Act.

Plaintiffs argue the No Surprises Act's judicial review provision applies only to individual IDRE payment determinations and not to the fraudulent scheme alleged in this case. They invoke the "strong presumption in favor of judicial review" absent "clear and convincing" evidence of congressional intent to preclude it. *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 370 (2018) (citation and internal quotation marks

omitted). According to Plaintiffs, the Act forbids judicial review of "determination[s] of a certified IDR entity under subparagraph (A)," and subparagraph (A) addresses only payment determinations, not eligibility determinations. 42 U.S.C. § 300gg-111(c)(5)(A), (E)(1).[2] Thus, "[n]othing in the NSA suggests that a scheme involving thousands of ineligible disputes is immune from judicial review." Dkt. 51 at 38.

I disagree with this interpretation. When the No Surprises Act is read as a whole, Congress provided the requisite clear and convincing evidence that judicial review is limited to the Federal Arbitration Act's narrow vacatur grounds.

First, the statutory structure of the Act makes eligibility part of the unreviewable "determination." Subparagraph (A) describes the IDRE's determination with respect to "a qualified IDR item or service." 42 U.S.C. § 300gg-111(c)(5)(A). Whether an item or service is "qualified" is an eligibility question, and an IDRE cannot make a payment determination without first deciding eligibility. Thus, eligibility determinations—because they are a necessary predicate to the payment determination—fall within the judicial review bar. *See Blue Cross Blue Shield Healthcare Plan of Georgia*, 2026 WL 2017291, at *8 ("[F]or there to be a payment determination under subparagraph (A), *there must be an eligibility determination* ... [so] the NSA's limitation on judicial review applies both to payment determinations and eligibility determinations under the text of the statute." (emphasis in original)).; *Blue Cross Blue Shield of Tex.*, 2026 WL 1557492, at *4 ("[I]nherent in the NSA's bar of judicial review of payment determinations is a limitation on the review of eligibility decisions."); *Anthem Blue Cross Life & Health Ins. Co.*, 2026 WL 982629, at *9.

***5** Second, Plaintiffs' interpretation of the statute would produce results Congress plainly sought to avoid. Congress incorporated the Federal Arbitration Act into the No Surprises Act to limit judicial review of IDRE determinations. *See Reach Air Med. Servs. LLC v. Kaiser Found. Health Plan Inc.*, 160 F.4th 1110, 1115 (11th Cir. 2025) ("We review arbitration decisions very narrowly, and ... [n]othing in the newly codified NSA ... has altered that limited scope of judicial review."); *Avraham Plastic Surgery LLC v. Aetna, Inc.*, No. 25-CV-784 (OEM) (SDE), 2025 WL 3779084, at *3 (E.D.N.Y. Dec. 30, 2025). Plaintiffs' reading would allow parties to litigate eligibility in federal court after every IDR proceeding, creating the very flood of lawsuits Congress intended to prevent. *Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.*, 2026 WL 2017291, at *9 ("If Congress intended to allow attacks on eligibility without judicial review, it ultimately would defeat Congress' intent to create a streamlined dispute resolution process."). Avoiding such absurd results is a basic canon of statutory interpretation and supplies the clear and convincing evidence required to overcome the presumption of reviewability.

Finally, even if Plaintiffs are correct that only payment determinations are unreviewable, their claims still fall within the bar on judicial review. Plaintiffs seek "[r]elief from all improperly-obtained NSA IDR awards" entered against them, Dkt. 1 at 103, and their theory depends on the assertion that IDREs issued inflated payment determinations because of Defendants' conduct. A challenge to eligibility necessarily challenges the resulting payment determination and triggers the provision in 42 U.S.C. § 300gg-111(c)(5)(E)(i).

In sum, Plaintiffs' theory that Defendants submitted ineligible disputes and thereby obtained improper IDR awards is inseparable from the IDR's payment determination process. Because Plaintiffs seek to unwind IDR awards through claims collateral to the permissible vacatur review, the Court lacks subject matter jurisdiction over those claims.[3]

### II. Vacatur (Count IX)

The No Surprises Act establishes an IDR process to resolve payment disputes between out-of-network providers and health plans. IDRE determinations are not subject to judicial review unless one of the exceptions laid out in 9 U.S.C. § 10(a)(1)–(4) applies. *Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 275 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 1493 (Jan. 12, 2026); *see also PHI Health, LLC v. Optimum Choice, Inc.*, No. 25-CV-2320-ABA, 2026 WL 850453, at *8 (D. Md. Mar. 27, 2026). Here, Plaintiffs argue "[e]ach individual IDR determination at issue was procured by undue means and fraud," warranting vacatur under § 10(a)(1); and "[f]or each individual IDR determination at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process," warranting vacatur under § 10(a)(4). Dkt. 1 ¶¶ 372–73.

#### a. § 10(a)(1)

A party moving for vacatur under § 10(a)(1) must demonstrate "the fraud or corruption was (1) not discoverable upon the exercise of due diligence prior to the arbitration, (2) materially related to an issue in the arbitration, and (3)

established by clear and convincing evidence." *Weirton Med. Ctr., Inc. v. QHR Intensive Res., LLC*, 682 F. App'x 227, 228 (4th Cir. 2017) (quoting *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 858 (4th Cir. 2010)). Where the grounds for fraud were discoverable and discovered by the challenging party, courts generally find that the arbitration award was not fraudulently obtained within the meaning of § 10(a). *See Portis v. Ruan Transp. Mgmt. Sys., Inc.*, No. 7:15CV00118, 2016 WL 7388403, at *3 (W.D. Va. Dec. 19, 2016) (citations omitted).

***6** Two federal courts addressing fraud claims arising out of the IDR process have held that vacatur is unavailable because the plaintiffs had the information necessary to object during the arbitration. In *Anthem Blue Cross Life and Health Insurance Company v. HaloMD LLC*, the court explained that Anthem did not allege facts showing it could not "litigate eligibility within the IDR process." 2026 WL 982629 at *7. Rather, Anthem did object to eligibility with respect to the determinations identified in its complaint, but the IDRE determined these disputes were eligible. *Id.* at *8. "[B]ecause the 'fraud' was known during the IDR and disclosed to the IDRE," vacatur was not justified. *Id.* Similarly, in *Aetna Health Inc. v. Radiology Partners, Inc.*, the court concluded that, where Aetna had previously terminated its contract with a defendant for submitting fraudulent claims, the allegations "fail[ed] to establish a sufficient basis excusing Aetna from challenging the IDR disputes on the basis that they were wrongfully submitted by in-network providers." 2026 WL 1556164 at *3.

Likewise, I conclude that Plaintiffs' allegations do not meet the substantive requirements for vacatur under § 10(a)(1).[4] Plaintiffs' own allegations show that the alleged fraud was discoverable and in fact discovered. The Complaint details the methods through which Plaintiffs inform providers of ineligible disputes, demonstrating their knowledge of items and services that are not covered by the IDR process. *See* Dkt. 1 ¶¶ 64–68. For example, Plaintiffs allege that on September 25, 2024, Defendants initiated 954 IDR proceedings, 943 of which were not eligible. *Id.* ¶ 126. In such cases, Plaintiffs may object to dispute eligibility, and the IDRE must determine a dispute is eligible before proceeding to payment determination. Notably, in addition to the open negotiations period between the health plan and the provider, the IDR process affords parties three other opportunities to object to eligibility: (1) through the IDR portal by the date of IDRE selection, 45 C.F.R. § 149.510(c)(1)(iii); (2) to the IDRE during the payment determination process, 29 C.F.R. § 2590.716-8(c)(4)(i)(B); *see also* 42 U.S.C. § 300gg-111(c)(5)(B)–(C); and (3) by reporting any error after dispute closure, Dkt. 58-4 at 5. Indeed, with respect to the specific healthcare claims identified in the Complaint, Plaintiffs did submit objections to eligibility to the presiding IDREs. *See id.* ¶¶ 166, 176, 185, 192, 198, 204, 210, 216, 221, 227, 233, 238, 245, 252, 258, 264, 270, 276; *see also id.* ¶ 130 (describing instances where disputes reached a payment determination "despite objections from Anthem"). Plaintiffs therefore cannot credibly claim that the alleged fraud was not discoverable and cannot satisfy the requirements of § 10(a)(1).

**b. § 10(a)(4)**

Vacatur is permitted under § 10(a)(4) "where the arbitrator[ ] exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," 9 U.S.C. § 10(a)(4), but not when the arbitrator commits "even serious errors of law or fact," *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) (citation omitted). "[A] plaintiff seeking relief under this provision bears the 'heavy burden' of showing that the arbitrator acted outside the scope of the authority granted by the parties in their contract, by 'issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract.' " *Famulus Health, LLC v. GoodRX, Inc.*, No. 2:24-CV-00886-BHH, 2024 WL 4151090, at *12 (D.S.C. Sept. 11, 2024) (quoting *Oxford Health Plans*, 569 U.S. at 569).

***7** Plaintiffs argue that IDREs exceeded their powers by issuing payment determinations on ineligible disputes. In *Anthem Blue Cross Life & Health Insurance Co. v. HaloMD LLC*, the court addressed the same argument and found that because IDREs are authorized to decide eligibility, they do not exceed their powers by issuing a payment determination on a dispute that is allegedly ineligible. 2026 WL 982629, at *8. As a result, judicial review of the IDRE's determinations was not available. *Id.* at *9. Likewise, in *Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. v. Halomd, Inc.*, the court explained that because IDREs have the right to determine whether certain items and services are eligible under the No Surprises Act, they also "have the power to determine their own jurisdiction and continue to make a payment determination." 2026 WL 2017291, at *24.

The same reasoning applies here. The No Surprises Act's implementing regulations grant IDREs the authority to determine eligibility. *See* 45 C.F.R. § 149.510(c)(1)(v)

("[T]he certified IDR entity selected must review the information submitted in the notice of IDR initiation to determine whether the Federal IDR process applies."). Indeed, a payment determination cannot occur unless the IDRE first determines that the dispute concerns a "qualified IDR item or service." 42 U.S.C. § 300gg-111(c)(5)(A). Thus, an IDRE does not exceed its powers by performing a task that the regulations require and the statute presupposes.

Plaintiffs therefore fail to plausibly allege grounds for vacatur under § 10(a)(1) or § 10(a)(4) under Federal Rule of Civil Procedure 12(b)(6).

## CONCLUSION

Defendants' Motions to Dismiss (Dkts. 37, 39) and related Request for Judicial Notice (Dkt. 57) are **GRANTED**. Because amendment would be futile, the Complaint is **DISMISSED** with prejudice.

### All Citations

Slip Copy, 2026 WL 2942234

Footnotes

1 Defendant AGS asks the Court to take judicial notice of six federal agency publications describing the IDR process. Dkt. 57. Plaintiffs do not oppose judicial notice of the existence of agency guidance documents but argue that these documents "cannot be used to establish facts in dispute at the motion to dismiss stage." Dkt. 71. I **GRANT** the request for judicial notice and consider the guidance documents as a description of how the IDR process is supposed to work, not as evidence of how it actually worked for any particular dispute. *See Anthem Blue Cross Life & Health Ins. Co. v. HaloMD LLC*, No. 8:25-CV-01467-KES, 2026 WL 982629, at *3 n.3 (C.D. Cal. Apr. 9, 2026).

2 The No Surprises Act's implementing regulations contain analogous provisions that refer to payment determinations when discussing the judicial review bar. *See* 45 C.F.R. § 149.510(c)(4)(ii), (vii).

3 The Court has discretion to exercise supplemental jurisdiction over state law claims that do not themselves have a basis for federal subject matter jurisdiction once the Court has dismissed the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Here, Plaintiffs' federal claims fail for the reasons stated above, and I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.

4 I assume but do not decide that Plaintiffs plausibly allege fraud for purposes of § 10(a)(1). Plaintiffs acknowledge that some eligibility disputes may arise in good faith and would not constitute fraud, but they contend that the disputes at issue here fall outside that category. Even accepting Plaintiffs' premise that the disputed claims were in fact ineligible for IDR, the Complaint does not allege facts supporting a reasonable inference that Defendants intentionally submitted ineligible disputes. *See Guardian Flight, L.L.C. v. Med. Evaluators of Texas ASO, L.L.C.*, 140 F.4th 613, 621 (5th Cir. 2025) (finding that the provider's allegations "fall short of fraud" where they do not support an inference of intentional misrepresentation). In fact, Plaintiffs allege that over 40 percent of disputes reaching payment determination were eligible for IDR, and they do not plead facts suggesting that Defendants acted in bad faith when submitting the 60 percent that were purportedly ineligible.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

2026 WL 3082464
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

ARIZONA PHYSICIANS IPA INCORPORATED, Plaintiff,
v.
IAS ARIZONA PLLC, Defendant.

No. CV-26-00667-PHX-KML
|
Signed October 14, 2026
|
Filed 10/15/2026

**Attorneys and Law Firms**

David C. Tolley, Pro Hac Vice, U. Gwyn Williams, Pro Hac Vice, William J. Trach, Pro Hac Vice, Latham & Watkins LLP, Boston, MA, Robert Matthew Kort, Dorsey & Whitney LLP, Phoenix, AZ, for Plaintiff.

Andrea Suzanne Tazioli, Michael A. McCanse, NCP Law PLLC, Phoenix, AZ, Harris J. Huguenard, Pro Hac Vice, Laura Marie Kidd Cordova, Pro Hac Vice, Jackson Walker LLP, Houston, TX, Michael J. Murtha, Pro Hac Vice, Jackson Walker LLP, Dallas, TX, for Defendant.

**ORDER**

Krissa M. Lanham, United States District Judge

***1** Arizona Physicians IPA Incorporated, d/b/a UnitedHealthcare Community Plan of Arizona ("United"), sued IAS Arizona PLLC for fraudulently submitting a medical insurance claim according to the procedures in the federal No Surprises Act ("NSA"). (Doc. 1 at 1–3.) United alleges IAS unlawfully submitted a claim ineligible for the NSA's dispute resolution process, forcing United to pay reimbursements and associated fees. (Doc. 13 at 1.) IAS moved to dismiss. (Doc. 11 at 1–2.) Because this court lacks subject matter jurisdiction, IAS's motion to dismiss is granted without leave to amend.

## I. Background

United alleges Congress enacted the NSA to shield individual members of private commercial health insurance plans from surprise medical bills (Doc. 1 at 11)—for example, those incurred when a member chooses an in-network hospital for surgery but receives anesthesia from an out-of-network provider. The NSA established a framework for health plans and providers to resolve billing disputes on their own without involving patients. (Doc. 1 at 11.) That process is called Independent Dispute Resolution ("IDR"). If an out-of-network provider disputes a reimbursement amount for services from a commercial health plan, either the provider or the plan may start IDR after an initial "open negotiation" period. (Doc. 1 at 11.) In IDR, the provider and the plan each submit proposed reimbursement amounts and a certified IDR Entity ("IDRE") makes a binding decision on which reimbursement figure is more appropriate. (Doc. 1 at 2–3, 12.) Disputes over insurance claims for patients covered by Medicare- or Medicaid-related plans are *not* eligible for submission to IDR; only claims submitted to and paid by certain commercial health plans qualify. (Doc. 1 at 5–7.)

IAS is an anesthesia services provider that is "out-of-network" with United, a health insurer. (Doc. 11 at 2.) In March 2025, IAS billed United for services provided to a Medicaid patient. (Doc. 1 at 15.) United paid IAS less than what IAS billed for, so IAS (through another organization, HaloMD, LLC) initiated the IDR process. (Doc. 13 at 4.) The IDRE eventually ruled in IAS's favor on the claim and ordered United to pay $1,575. (Doc. 1 at 20.)

United alleges this particular claim was ineligible for the IDR process from the start because the patient was insured through a managed Medicaid plan. (Doc. 1 at 15.) United alleges IAS "should have known" the claim was made under a Medicaid plan but "fraudulently attested" that the claim qualified for IDR. (Doc. 1 at 15, 19.) IAS's purportedly "deliberate misrepresentation to the IDRE, on which the IDRE relied," forced United to expend resources to handle the claim and pay IAS's requested reimbursement amount in full instead of the Medicaid rate. (Doc. 1 at 28.)

United brings a claim for declaratory relief under 28 U.S.C. §§ 2201 and 2202 and an Arizona common-law fraud claim. (Doc. 1 at 26–29.) IAS moved to dismiss for lack of subject matter jurisdiction, for failure to state and particularly plead a claim of fraud, and for failure to join a necessary party (the IDRE). (Doc. 11 at 3–5.)

## II. Legal Standard


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

***2** A Rule 12(b)(1) attack on subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted). "In a facial attack" like the one here, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

## III. Analysis

"A federal court can decide cases only when it has subject matter jurisdiction." *Shamrock Development Co. v. City of Concord*, 656 F.2d 1380, 1384 (9th Cir. 1981). To possess subject matter jurisdiction "[a]bsent diversity of citizenship, federal-question jurisdiction is required." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Generally, a court has federal-question jurisdiction only if a federal question appears on the face of the plaintiff's well-pleaded complaint. *Id.*

However, federal courts may sometimes find federal-question jurisdiction where a federal issue is "a necessary element" of a state-law claim. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006). A four-part test governs whether a state-law claim falls into this "slim category." *Id.* at 701; *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). The federal issue within the state-law claim must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

United does not argue that its claim for declaratory judgment under 28 U.S.C. §§ 2201 and 2202 confers jurisdiction. (Doc. 13 at 6–9.) Nor could it. "The operation of the Declaratory Judgment Act is procedural only and does not confer arising under jurisdiction." *Cal. Shock Trauma Air Rescue v. State Compensation Ins. Fund*, 636 F.3d 538, 543 (9th Cir. 2011) (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)) (simplified). That leaves United's state-law fraud claim as the only potential source for subject matter jurisdiction.

That claim does not confer jurisdiction either. To start, the claim fails the well-pleaded complaint rule because it is not "based on federal law."[1] *Stillaguamish Tribe of Indians v. Washington*, 913 F.3d 1116, 1118 (9th Cir. 2019) (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)). United's allegations that IAS knowingly violated the NSA do not "constitute a federal claim" or "transform" a state-law fraud claim into a federal one. *Pozez v. Clean Energy Cap., LLC*, 593 F. App'x 631, 632 (9th Cir. 2015).

***3** United's fraud claim likewise fails *Grable* because it does not present a "substantial" federal issue. Courts assess substantiality by considering "the importance of the issue to the federal system as a whole." *Id.* at 260. Issues may be substantial when they, for instance, "require[ ] an interpretation of a federal statute" or will "be controlling in numerous other cases." *City of Oakland*, 969 F.3d at 906 (quoting *Empire Healthchoice*, 547 U.S. at 700). United argues the federal issues are substantial because they are "significant to the federal system" and present "nearly pure issue[s] of law." (Doc. 13 at 8.) In reality, the disputed issues are primarily factual. United's fraud claim does not require an analysis of competing legal interpretations of the NSA; both parties agree Medicaid claims are not eligible for IDR under that statute and its implementing regulations. (Doc. 16 at 2 n.2.) At most, the elements of fraud would implicate whether IAS made a false representation when it submitted the claim at issue.[2] *Gibbons v. Williams*, 378 P.2d 926, 927 (Ariz. 1963). But that is a fact-bound determination specific to the case at hand, not a legal interpretation of the NSA. And given the limited impact such a factual determination would have on *any* other case—much less "numerous other cases," *Empire Healthchoice*, 547 U.S. at 700—the federal issue here is not "significant to the federal system as a whole." *Gunn*, 568 U.S. at 264; *see also UnitedHealthcare Ins. Co. v. Maui Mem'l Emergency Med. Assocs., Inc.*, No. 26-cv-00040-DKW-WRP, 2026 WL 1965882, at *4 (D. Haw. July 7, 2026) (finding a claim nearly identical to the one here did not raise a "substantial" federal issue); *UnitedHealthcare of Pa., Inc. v. Northstar Anesthesia of Pa., LLC*, No. 25-cv-7187, 2026 WL 1145885, at *8 (E.D. Pa. Apr. 26, 2026) (same).

A claim must pass all four of *Grable*'s hurdles for jurisdiction to lie. *Gunn*, 568 U.S. at 258. Because the federal issue within United's fraud claim is not "substantial," the court's analysis may end there. *City of Oakland*, 969 F.3d at 907. *Grable* does not supply federal-question jurisdiction here.

## IV. Conclusion

Both of United's claims are dismissed for lack of subject matter jurisdiction. Leave to amend is not appropriate because any amendment would futile: the core of United's complaint does not give rise to a federal issue that satisfies all four *Grable* factors.[3] Dismissal is without prejudice. *Tijerino v.*

*Stetson Desert Project, LLC*, 934 F.3d 968, 971 n.2 (9th Cir. 2019) ("[I]n general, dismissal for lack of subject matter jurisdiction should be without prejudice.").

Accordingly,

**IT IS ORDERED** the Motion to Dismiss (Doc. 11) is **GRANTED**. The complaint is **DISMISSED WITHOUT PREJUDICE** and **WITHOUT LEAVE TO AMEND** for lack of subject matter jurisdiction. The Clerk of Court shall enter judgment and close this case.

**All Citations**

Slip Copy, 2026 WL 3082464

Footnotes

1 The Ninth Circuit has previously said a state-law claim implicates federal-question jurisdiction only if the complaint satisfies "*both* the well-pleaded complaint rule *and* passes" *Grable*'s test. *Newtok Vill. v. Patrick*, 21 F.4th 608, 619 (9th Cir. 2021) (citing *Cal. Shock Trauma*, 636 F.3d at 542). An alternative approach views *Grable* as an "exception" to the well-pleaded complaint rule. *E.g.*,*City of Oakland v. BP PLC*, 969 F.3d 895, 904 (9th Cir. 2020); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022). This split in authority appears to stem from courts' different conceptions of precisely what the "well-pleaded complaint rule" requires. The distinction does not affect the outcome here because United satisfies neither the well-pleaded complaint rule nor *Grable*.

2 Independently, even if United could establish that IAS made a false representation, United has pleaded its fraud claim out of court. An Arizona fraud claim requires the same party who is ignorant of and relies on the falsity to suffer the consequent injury. *Borecki v. Safeguard Sec. & Commc'ns, Inc.*, No. CV-11-1983-PHX-GMS, 2012 WL 1343952, at *2 (D. Ariz. Apr. 18, 2012), *aff'd*, 540 F. App'x 811 (9th Cir. 2013) (quoting *Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 631 (Ariz. 1982)). Yet United knew the claim at issue was ineligible for IDR at the outset (Doc. 1 at 19–20), and the IDRE's alleged reliance on the falsity did not cause that entity injury. *Id.* These defects in United's allegations are sufficient alternative grounds for dismissal.

3 Leave to amend would be futile also because the NSA forecloses judicial review of IDR determinations subject to limited exceptions. 42 U.S.C. § 300gg111(c)(5)(E)(i); 9 U.S.C. § 10(a)(1)–(4). United's allegation that it knew IAS's eligibility attestation was false (Doc. 1 at 19–20) forecloses the only exception that could apply, for judicial review of fraudulently-procured awards. 9 U.S.C. § 10(a)(1); *Anthem Blue Cross Life & Health Ins. Co. v. HaloMD LLC*, No. 8:25-cv-01467, 2026 WL 982629, at *10 (C.D. Cal. Apr. 9, 2026) (declining to vacate IDR award based on allegedly fraudulent eligibility attestation because doing so would be an "end run[ ] around the NSA's limits on judicial review"), *appeal docketed*, No. 26-2355 (9th Cir. Apr. 16, 2026).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 3

# *Flouting Consumer Law, Insurers Refuse to Pay Medical Bills for Emergency Care*

A law to end surprise medical bills has generated millions of high-dollar payouts for doctors. Health plans are now fighting back by frequently withholding money.

Listen · 15:04 min





**By Margot Sanger-Katz and Sarah Kliff**

The authors are covering the implementation of the No Surprises Act. They welcome tips at nytimes.com/tips.

Nov. 3, 2026

**See more of our coverage in your search results.**

Add The New York Times as a preferred source on Google ›

Over the past two years, Flight for Life has airlifted car crash victims, premature babies and adults struggling to breathe to hospitals across southeastern Wisconsin.

Anthem, the major health insurer, covered dozens of those patients, but it has refused to pay $2.1 million it owes the company for their helicopter rides.

The amounts due for each emergency medical flight range from $9,382 to $62,373. Anthem has historically paid its bills, but late last year it suddenly stopped.

“It was like a faucet they just shut off,” said Flight for Life’s executive director, Leif Erickson.

The insurer’s willful nonpayment is the latest in a cascade of unintended consequences brought about by a widely supported law that was intended to protect patients from surprise medical bills.

The law, which took effect in 2022, calls for arbitrators to decide appropriate levels of reimbursement, and it has already triggered millions of disputes between medical care providers and insurers. Doctors have prevailed overwhelmingly, winning arbitration settlements that sometimes far exceeded the usual insurer rates.

Now, fed up with what they consider unfair outcomes, insurers are fighting back by refusing to pay.

The law, the No Surprises Act, was enacted with a large bipartisan majority to ensure patients never got excessive bills in situations, like emergencies, where they could not pick their doctors.



Leif Erickson, the executive director of Flight for Life, in the hangar of Waukesha County Airport. Jamie Kelter Davis for The New York Times

The arbitration system set up by the law was supposed to resolve billing disputes when health care providers and insurers could not agree on a price: An arbitrator reviews a proposed dollar amount from each side and decides which one is most reasonable. Insurers are required to pay that amount within 30 days, and billing patients for anything beyond that is prohibited.

Lawmakers expected the system to be used rarely and to produce reasonable payments. Instead, doctors and other health care providers have been swamping arbitrators with millions of claims, often for amounts that far exceed what is customarily paid for a service. And they have won the vast majority of their cases — sometimes receiving sums such as $440,000 for a breast reduction, $73,000 for an ankle X-ray, or $125,000 for assisting on prostate surgery.

Insurers have sued doctors and lobbied Congress to change the law, contending that the

large awards and lopsided results are driving up health insurance premiums.

But with Washington moving slowly, they have adopted the strategy of simply declining to pay.

Nearly 30 percent of arbitration awards has gone unpaid since 2024, according to an analysis of 400,000 such awards provided by a major medical billing firm that The New York Times reviewed.

Anthem's nonpayment rate was the highest by far, at 74 percent, but other large insurers, including Cigna, UnitedHealthcare and Aetna, have also declined to pay a significant portion.

## Insurers often don't pay awards

Share of cases where the insurer did not pay the arbitration award, according to data from HaloMD, a medical billing firm

| | |
|---|---|
| Anthem | 74% |
| Cigna | 53% |
| **All insurers** | 29% |
| United | 24% |
| Aetna | 24% |
| Health Care Service Corporation | 12% |

Note: Analysis of 409,102 cases from January 2024 to July 2026. Only includes cases in which payments to doctors could be reliably tracked. Source: HaloMD. By The New York Times

The standoff has created dysfunction and lawlessness in a system that a growing number of lawmakers and administration officials say needs to be changed.

"The providers are succeeding in what feel like egregious award levels, and then the insurers are also doing some of this egregious behavior by not paying," said Katie Keith, the director of Georgetown University's Center for Health Policy and the Law. "But there's not accountability on either side."

Health plans, including Anthem, criticize HaloMD, the company that provided The Times with payment data, for using business tactics that exploit the arbitration system and result in large payouts. Only one of the major insurers The Times contacted disputed the accuracy of the data. A Cigna spokeswoman said that a significantly smaller share went unpaid in 2026 than what the Halo data showed.

**Sign up for the Your Money newsletter** Get a better grasp on your finances. Get it sent to your inbox.

Most large health insurers told The Times it is their policy not to pay awards if they believe the claim should never have qualified for the arbitration process, even when the arbitrator determined it to be eligible.

In the case of Flight for Life, Anthem says it will not pay because it believes the medevac service violated the arbitration system's complex procedural rules, an assessment Flight for Life disputes.




The health insurance company Anthem has accused Flight for

Life of violating the arbitration system's complex procedural rules, an assessment Flight for Life disputes. Jamie Kelter Davis for The New York Times

Ariel Bayewitz, vice president of health economics at Elevance Health, Anthem's parent company, said that the company "believes strongly" in paying eligible awards on time. But, he said, Anthem estimates that most claims that have moved through the arbitration system should have been found ineligible, because they either didn't follow the rules or were for situations not covered under the consumer protection law.

"More providers are submitting ineligible cases because ineligible cases aren't being dismissed like they should be," he said.

Smaller health plans also have been withholding payments in cases where they think the award is unreasonable. Some even have form letters they send to doctors whose awards they won't pay.

"The determination is not merely high; it is legally defective," says one such letter, from the New York insurer EmblemHealth, declining to pay an award 99 times its usual rate for a breast reconstruction.

"Recently, we have observed a significant increase in very high-dollar claims, which we are actively reviewing and challenging as appropriate," said Alex Gomez, a spokesman for the plan.

A spokeswoman for the Centers for Medicare and Medicaid Services, which oversees the arbitration system, said the law always requires insurers to pay arbitration awards.

Doctors and air ambulance companies have turned to the courts, filing hundreds of lawsuits to enforce the arbitrators' decisions, but three federal appeals courts have ruled that the No Surprises Act does not include a right to sue.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

Stephen Ware, a professor of law at the University of Kansas, said that unlike most arbitration situations, the No Surprises Act does not explain how a ruling can be enforced. One appeals court decision suggested that the government could sue to force insurers to pay. So far, the Trump administration has not exercised such power.

## 'We Just Want to Get Paid'



Dr. Jennifer Raley is a managing partner with Wake Emergency Physicians, serving patients in central and eastern North Carolina. "We just want to get paid what we need to pay the people who saw the patients," she said. Kate Medley for The New York Times

Doctors have said that the nonpayments make it hard to manage their practices. Some who have built their businesses around the arbitration system and its high payouts have taken on debts to stay afloat.

Dr. Jennifer Raley, a managing partner at Wake Emergency Physicians in North Carolina, said her practice had $1.2 million in outstanding awards. It won 1,032 arbitration cases in 2025, with an average award around four times what insurers typically pay.

In January, it had to take out a line of credit to make payroll.

"We just want to get paid what we need to pay the people who saw the patients," she said. PHI, a national air ambulance company, recently closed a base in Red Bluff, Calif., a small city between Sacramento and the Oregon border.

In an interview, PHI's chief executive, Scott McCarty, cited $16.3 million in outstanding

payments from Anthem as the cause of the closure.

“The insurance companies cannot unilaterally decide to breach a federal law if they don’t like the end result,” Mr. McCarty said. “That’s essentially what they are doing.”

Anthem spokeswoman Janey Kiryluik said that the insurer was “actively trying to bring PHI Air Medical into our network,” but that the medevac company had requested unreasonably high rates. She said that, in arbitration, it typically requests $56,000 per flight.

Dr. Brian McHugh, a neurosurgeon from Long Island, N.Y., has repeatedly received letters from Anthem challenging his awards on the grounds they are too expensive. Dr. McHugh often wins arbitration awards that are 40 times higher than what Anthem typically pays, according to federal data.




Anthem’s headquarters in Indianapolis in 2019. The company has refused to pay about 74% of the arbitration cases it has lost. Michael Conroy/Associated Press

He said other doctors at his practice had stopped seeing Anthem patients.

Ms. Kiryluik said the insurer does not use a financial threshold as a “basis for holding payment,” and that it no longer uses the letter Dr. McHugh received.

Anthem, like all major insurers, supported the No Surprises Act when Congress was writing the legislation during the first Trump administration. But over the last six years,

the company's executives have soured on the law's arbitration system, saying that it encourages abusive billing. Many of the high awards have been for scheduled procedures, not the emergency care the law was written to address.

Anthem defends its nonpayment policies as intentional. In a 13-page report, it estimated that 60 percent of its cases that arbitrators had decided should never have qualified. This year, it has not paid 83 percent of arbitration claims, according to the HaloMD data, a substantial jump from previous years.

The Labor Department, which oversees large employer health plans, is investigating Anthem's failure to pay arbitration awards, according to documents The Times obtained. Ms. Kiryluik, the Anthem spokeswoman, said the plan was cooperating with the investigation.

The 400,000 claims that HaloMD shared with The Times make up around two-thirds of the total arbitration cases it has won since 2024. The data set only includes cases for which HaloMD could reliably track payments to doctors.

Anthem and other insurers contend that HaloMD is part of the problem. They say Halo typically submits unreasonably high bids to arbitration, sometimes winning 113 times typical insurer payments. The company has also been accused of filing a high volume of ineligible claims. Five insurers have sued Halo, accusing it of fraudulent behavior. Three of them, including one from Anthem, have been dismissed in federal court, on the grounds that courts can't review the arbitrators' decisions.

HaloMD spokesman Patrick Velliky said that the insurers' lawsuits were "an attempt to intimidate physicians and clinicians out of seeking fair and sustainable reimbursement."

The law set up a series of deadlines and procedures that doctors need to follow. They limited access to the system to certain situations. Cases where the patient has a government plan, like Medicare or Medicaid, are not eligible. Nor are situations where the doctor already has a contract with the health plan.

Insurers say they sometimes see doctors winning two times for the same care — first in a state-level system to resolve medical billing disputes, and then again through federal arbitration.

"We're not going to pay it twice," said Josh Goldberg, executive director of heath policy at Health Care Service Corporation, which covers 27 million people through six Blue Cross affiliates. "This is just a situation where we're a little bit between a rock and a hard place."

The insurer is "not the final decider," said Ms. Keith. She described Anthem's strategy as

"high-risk" because it flouts binding arbitration decisions.

But insurers expressed frustration that the system incentivizes arbitrators to find claims eligible. They get paid a flat fee for each dispute they resolve. If they rule a case is ineligible, they earn nothing.

## New Movement in Congress



Congress passed the No Surprises Act, with a large bipartisan majority in 2022 to ensure that patients would not get excessive bills in emergency situations. Kenny Holston/The New York Times

The No Surprises Act gives the Trump administration authority to fine health insurers $100 for each day they do not pay an arbitration award. So far, it has not issued a single penalty.

Doctors have submitted hundreds of complaints about unpaid awards to the Centers for Medicare and Medicaid Services, which oversee the system. Those that The Times spoke with said they had rarely received a response.

"There has to be some enforcement," said Thomas LaGreca, a partner at Callagy Law, which files claims for providers. He estimates that 27 percent of clients claims remain unpaid six months after arbitration decisions. Health plans also said that C.M.S. had failed to respond to thousands of complaints about the large number of ineligible claims.

Spokespeople for both C.M.S. and the Labor Department declined to respond to questions about why they had not issued penalties to enforce the No Surprises Act.

A Trump administration spokesman told The Times in July that "the system is being gamed" by doctors and that the government was "actively working to clean it up." The administration has not yet announced any policy changes.

Congress has recently taken a greater interest in reform, with one Senate committee hosting round table meetings and a top House Democrat introducing new legislation.

"There are problems on both sides, and I'll readily admit that," Representative Greg Murphy, Republican of North Carolina, said in an interview.



Representative Greg Murphy, Republican of North Carolina, has introduced legislation that would stiffen penalties for nonpayment by insurers. Kevin Dietsch/Getty Images

But Mr. Murphy, who worked as a urologist before running for office, said he believed that the "majority of abuses" had been committed by insurers who do not pay awards. He has introduced legislation that would stiffen penalties for nonpayment.

"I ran a small business," he said. "If I don't have income, guess what happens to the business? It dies."

Senator Bill Cassidy, Republican of Louisiana, chairs the Senate Health Committee and

was an architect of the No Surprises Act. He has told those involved in the process that he views fixing its problems before he leaves office in January as a legacy project.

Representative Frank Pallone Jr., Democrat of New Jersey, was also an author of the original law. He has a different idea: abolishing the complex arbitration system altogether. Last month, he introduced a bill that would resolve billing disputes by setting a flat payment for doctors at the level insurers typically pay.

Mr. Pallone has been skeptical of arbitration supporting it as part of a compromise to get the surprise billing ban passed. He said the reality was even more chaotic than he had predicted. “We have the proof with the facts that shows that this arbitration system is out of hand,” he said.

**Margot Sanger-Katz** is a reporter covering health care policy and public health for the Upshot section of The Times.

**Sarah Kliff** is an investigative health care reporter for The Times.

---

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Flouting a Law, Insurers Refuse to Pay Some Bills